## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION,<br>100 F Street, N.E.<br>Washington, D.C. 20549<br><br>Plaintiff,<br><br>v.<br><br>AON CORPORATION<br>200 East Randolph Street<br>Chicago, Illinois 60601<br><br>Defendant. | Civil Action No. _____ |

## COMPLAINT

Plaintiff, U.S. Securities and Exchange Commission (the "Commission"), alleges:

## SUMMARY

1.      From as early as 1983 until as recent as 2007, subsidiaries of Aon Corporation ("Aon" or the "Company") in numerous countries made improper payments to various parties as a means of obtaining or retaining insurance business in those countries.  During this period, over $3.6 million in such payments were made, including some directly or indirectly to foreign government officials who could award business directly to Aon subsidiaries, who were in position to influence others who could award business to Aon subsidiaries, or who could otherwise provide favorable business treatment for the Company's interests.

2.      These payments were not accurately reflected in Aon's books and records.

3.       During this period, Aon failed to maintain an adequate internal control system reasonably designed to detect and prevent these payments.

4.       Plaintiff brings this action to enjoin such acts and practices, which violate Sections 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

## JURISDICTION

5.       This Court has jurisdiction over this action under Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].  Aon, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

6.       Venue is appropriate in this Court under Section 27 of the Exchange Act [15 U.S.C. § 78aa] or 28 U.S.C. § 1391(d).

## DEFENDANT

7.       Aon is a Delaware corporation headquartered in Chicago, Illinois, and is a global provider of risk management services, insurance and reinsurance brokerage, and human capital solutions and outsourcing.  Its common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and is listed on the New York Stock Exchange (NYSE: AON).

## FACTS

8.       The improper payments made by Aon's subsidiaries fall into two general categories:  (i) training, travel, and entertainment provided to employees of foreign

government-owned clients and third parties and (ii) payments made to third-party facilitators.

### A.   Training, Travel, and Entertainment

#### 1.   Costa Rica

9.      Aon's U.K. subsidiary, Aon Limited, engaged in reinsurance business with the Instituto Nacional De Seguros ("INS"), a government-owned reinsurance company in Costa Rica.   All insurance agreements in Costa Rica, including the reinsurance contracts that Aon Limited obtained to insure Costa Rican entities, were required to be issued through INS.   The head of INS is appointed by the Costa Rican president.

10.     Beginning in approximately the early 1990s, INS and various reinsurers began the process of creating funds in connection with reinsurance policies that were issued by the reinsurers for INS.   In 1995, one of the reinsurers, Alexander Howden, a U.K. company, created one such fund, the "Brokerage Fund" or the "Training and Education Fund."

11.     Aon acquired Alexander Howden in 1997, and Aon Limited oversaw the Brokerage Fund from that point forward.

12.     During the term of Aon's involvement with the Brokerage Fund beginning in 1997, Aon Limited contributed to the Brokerage Fund by allocating a portion of the brokerage commission on the INS account to the Brokerage Fund each year.   Through this contribution, and including the additional money deposited by Alexander Howden, approximately $215,000 was deposited into the Brokerage Fund from 1995 until 2002.

13.     In 1999, INS changed how it collected funds for training and educational purposes.   Pursuant to this change, at INS's direction, Aon Limited managed a second

account known as the "3% Fund" or the "Reinsurers' Fund," during the years 1999—

2002. INS directed that Aon Limited set aside 3% of the gross ceded premiums paid to

reinsurers in connection with INS policies in order to finance the 3% Fund. The 3% set-

aside for the fund was noted on the face of the associated reinsurance policy slips as

funding for training and education.

14.     The funding for the 3% Fund originated from premiums paid by the cedent

(INS) to reinsurers, and INS required Aon Limited to manage the 3% Fund, handle the

documentation, and administer payments from the fund. When INS adopted the new 3%

Fund, it also instructed Aon Limited to continue to operate the Brokerage Fund.

15.     Aon Limited contributed approximately $660,000 to the 3% Fund from

1999 until 2002.

16.     The purported purpose of both the Brokerage Fund and the 3% Fund was

primarily to provide education and training for INS employees. Aon Limited

administered and disbursed money from both funds at INS's direction. INS officials

required that Aon Limited both contribute to the Brokerage Fund and administer the

funds in order to continue its business in Costa Rica, as INS had full autonomy of all

insurance business conducted in the country. INS would provide Aon Limited with an

invoice, supposedly from a third-party service provider, and Aon Limited would pay the

third party accordingly, usually from the fund specified by INS.

17.     Aon Limited disbursed nearly all of the $215,000 in the Brokerage Fund

from 1997 until 2005, and approximately $650,000 of the money in the 3% Fund from

1999 until 2002, to pay for the third-party services on behalf of INS officials. These

services often included travel-related expenses, such as airfare and hotel

accommodations, as well as educational conference fees, meals, and other related expenses. It was common for INS to hire a travel agency to arrange for the particulars of the purported travel and educational conferences to which it invited a number of its employees and other individuals in the insurance industry.

18.    The majority of the amounts paid out of the two funds managed by Aon Limited were to a tourism company in Costa Rica with which the head of reinsurance placement at INS was connected. This INS official served on the board of directors of the tourism company, and the company's accounting records referenced commission payments to the official during time periods that coincided with times when Aon Limited made payments to the company from the two funds. Some of the expenses that Aon Limited paid from the two funds were on behalf of this same official and his family members. The INS official took 14 trips from 1996 to 2001 with expenses totaling $44,000 that were paid from the two funds, and included expenses associated with the official's wife, who accompanied him on at least five of the trips. At times, Aon Limited directly reimbursed the official for claimed expenses with cash payments.

19.    A substantial number of the purported educational conferences were to attractive tourist destinations, such as London, Paris, Monte Carlo, Zurich, Munich, Cologne and Cairo, and had no discernable business purpose. Additionally, the subject matters of some conferences and training for which Aon Limited facilitated the reimbursement had no apparent connection to the insurance industry. In some instances, Aon Limited paid third parties at the direction of INS officials where the business purpose of the travel or expenses cannot be discerned from the documentation, or where the purpose of the travel and expenses clearly had no connection to the insurance

industry, such as those pertaining to literary conferences, holiday expenses, pure entertainment or extensive leisure activities, as well as family-related travel. Aon Limited's employees provided reimbursement for the INS officials without regard to the nature of the expense.

20.     The records maintained by Aon Limited in connection with the payments that it made from both the Brokerage Fund and the 3% Fund typically gave the name of the tourist agency being paid and a generic description, such as "Various airfares & hotel." Additionally, to the extent the accounting records did provide the location or purported educational seminar associated with travel expenses, those records did not, in many instances, also identify the leisure and non-business related activities included in the costs.

### 2.     Egypt

21.     From 1983 through April 1, 2009, Aon and its predecessor, Alexander & Alexander, served as insurance broker for an Egyptian government-owned company, the Egyptian Armament Authority ("EAA"), and its U.S. arm, the Egyptian Procurement Office ("EPO"). Aon acquired Alexander & Alexander in 1996. The EAA account, from 1996 through April 1, 2009, was serviced by Aon Risk Services ("ARS"), through an office in Baltimore, Maryland.

22.     In 1998, ARS began sponsoring an annual trip to the United States for a delegation of officials from the EPO and EAA. The delegation trips were incorporated into a written contract between ARS and EAA, which provided that the trips would be at ARS's expense. All of the delegation trips were to destinations in the United States, and typically included visits to New York, Philadelphia, Baltimore, and Washington, D.C.

23.     The contract between ARS and the EAA initially provided for a ten-day delegation for two Egyptian officers with a cost not to exceed $10,000.  Beginning in 2003, the budget was increased to $15,000 per year.  Prior to 2004, ARS paid for the delegation trips by providing a cash payment to the EAA and ARS's Egyptian agent.

24.     In 2004, ARS assumed responsibility for organizing the travel for the Egyptian delegation and paid the associated expenses.  While the trips arranged and paid for by ARS had some business component, they also included a disproportionate amount of leisure activities and lasted longer than the business component would justify.

25.     Between 1998 and 2007, ARS paid $100,000 for travel-related expenses of EAA and EPO officers, and earned brokerage commissions of $1.4 million during 2001—2007 on the EAA and EPO accounts.  Following an internal compliance review, ARS terminated its practice of paying for the delegation trips.  ARS's and Aon's books and records did not fairly and accurately reflect the true nature of the payments made in connection with the delegation trips.

**B.     Payments to Third-Party Facilitators**

26.     Aon's subsidiaries also made payments to third parties that were retained to assist in obtaining accounts in several countries.  In some instances, the subsidiaries made payments to the third parties without taking steps to assure that they would not be passed to foreign government officials.  The subsidiaries made some payments under circumstances in which the third parties appeared to have performed no legitimate services relating to the prospective accounts, thereby suggesting that they were simply conduits for improper payments to government officials in order to obtain or retain business for Aon.

### 1.    Vietnam

27.    Aon Limited served as a co-broker on an insurance policy for Vietnam Airlines, a Vietnamese government-owned entity, since 2003. Aon Limited in the United Kingdom and Aon Vietnam Limited in Vietnam administered the account.

28.    In 2002, Aon Limited retained a third-party facilitator to assist in securing the appointment as insurance broker for a 30% share of the Vietnam Airlines account in the 2003 policy year, and to retain a share of that account in subsequent years. The third-party facilitator was to provide "information and services" to enable Aon Limited to obtain the appointment with Vietnam Airlines.

29.    Company records indicate that the third-party facilitator did not provide legitimate services, but instead transferred some of the money that Aon Limited paid under its consultancy agreement to unidentified individuals referred to as "related people."

30.    Aon Limited paid the third-party facilitator $650,000 between 2003 and 2006, and earned brokerage commissions of $2.2 million on the Vietnam Airlines account between 2003 and 2007. Aon terminated its relationship with the third-party facilitator in 2007.

### 2.    Indonesia

31.    From 2002 until 2007, Aon Limited served as a broker on reinsurance contracts with BP Migas and Pertamina, two Indonesian state-owned entities in the oil and gas industry.

32.    The energy risks for these two companies were insured by a local consortium led by Tugu Pratama Indonesia ("Tugu Pratama"). Aon Limited obtained

brokerage contracts on the BP Migas and Pertamina accounts through agreements with the Tugu Pratama consortium.

33.     During that period, several former Aon Limited employees authorized improper payments to government officials in Indonesia to secure the Pertamina and BP Migas accounts for Aon Limited.

34.     These improper payments were to be made through an individual consultant and a company.

35.     Between 1998 and 2000, Aon Limited paid the consultant approximately $100,000 as a retainer for his agreement to make efforts to secure the Pertamina account for Aon Limited.

36.     As part of Aon Limited's relationship with the consultant, Aon Limited further agreed to pay the same consultant, a company for which the consultant was a principal, and "other interested parties," a percentage of Aon Limited's premiums if the consultant was successful in securing the Pertamina account for Aon Limited. Although the agreement was made, Aon Limited did not actually make any payments under the agreement.

37.     Separately, Aon Limited paid another company $100,000 to assist in securing both the Pertamina and BP Migas accounts. In 2004, officials at BP Migas and Tugu Pratama urged Aon Limited to enter into a co-brokering agreement with this company as Aon Limited's local broker in Indonesia on the BP Migas and Pertamina accounts, either as a pre-condition to continuing any future business with Aon Limited, or in exchange for some future undefined benefit to Aon Limited.

38.     Additionally, two Aon brokers also made $100,000 in payments to a third-party introducer in 2004 and 2005 for its purported assistance in obtaining the BP Migas account for Aon Limited.

39.     Aon Limited earned $4.5 million on the Pertamina account during 2002—2007, and $3.6 million on the BP Migas account during 2004—2006.  Aon Limited resigned from both accounts in 2007 after Aon's Compliance Department discovered the arrangements that had been made on Aon Limited's behalf in obtaining the accounts.

### 3.     United Arab Emirates

40.     As a result of the acquisition of a broker in 1997, Aon Limited provided brokerage services to a privately-held insurance company in the United Arab Emirates. From 1983 until 1997, payments had been made to the general manager of the insurance company as inducements to secure and retain the account for Aon Limited.

41.     Following the 1997 acquisition, Aon Limited continued to authorize payments to a "Sharjah Commission" account in the Middle East.  The payments were purportedly made to a third-party consultant, but were ultimately funneled to the general manager of the insurance company.  Aon Limited made $588,000 in payments under this arrangement between 1997 and 2007, and earned $1.3 million in brokerage commissions on the account during 2003—2006.  Aon's Compliance Department terminated the payment scheme after learning of it in mid-2007.

### 4.     Myanmar

42.     Between 1999 and 2005, Aon Limited retained an introducer in Myanmar to assist Aon Limited in connection with its account with Myanmar Airways (assured) and Myanmar Insurance (reinsured), two government-owned entities.

43.     Aon Limited made a total of $3.25 million in payments to the introducer.

44.     Company records indicate that the introducer likely used a portion of his commission to improperly influence a government official on Aon Limited's behalf in connection with the Myanmar account.  These records suggest that the introducer made payments to a senior manager at Myanmar Insurance in exchange for his promise to "protect [Aon Limited's] interests."

45.     Email records also evidence awareness by employees of Aon Limited that the introducer had proposed other payment arrangements to Aon Limited during the term of Aon Limited's Myanmar account.

### 5.     Bangladesh

46.     Aon Limited made approximately $1.07 million in payments to secure its account with Biman Bangladesh Airways (assured) and Sudharan Bima Corporation (reassured), two government-owned entities, for policy terms 2002—2007.  Aon Limited made these payments to a former Aon Limited employee who was appointed as an introducer appointed representative, and to a company also retained as a third-party consultant on the Biman account.

47.     Company email records document the knowledge of Aon Limited's employees that the former employee was using a percentage of the money that he received from Aon Limited to provide finder's fee payments to an individual believed to be the son of a former high-ranking government official in Bangladesh with several important political connections.

48.     Aon Limited's employees believed they would need to make "payaways to someone" in order to acquire the Biman account.

## CLAIMS FOR RELIEF

## FIRST CLAIM

### [Violations of Section 13(b)(2)(A) of the Exchange Act]

Paragraphs 1 through 48 are realleged and incorporated by reference.

49.     As described above, Aon, through its officers, agents, and subsidiaries,

failed to keep books, records, and accounts, which, in reasonable detail, accurately and

fairly reflected its transactions and dispositions of its assets.

50.     By reason of the foregoing, Aon violated Section 13(b)(2)(A) of the

Exchange Act  [15 U.S.C. § 78m(b)(2)(A)].

## SECOND CLAIM

### [Violations of Section 13(b)(2)(B) of the Exchange Act]

Paragraphs 1 through 48 are realleged and incorporated by reference.

51.     As described above, Aon failed to devise and maintain a system of internal

accounting controls sufficient to provide reasonable assurances that: (i) transactions were

executed in accordance with management's general or specific authorization; and

(ii) transactions were recorded as necessary (I) to permit preparation of financial

statements in conformity with generally accepted accounting principles or any other

criteria applicable to such statements, and (II) to maintain accountability for its assets.

52.     By reason of the foregoing, Aon violated Section 13(b)(2)(B) of the

Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final

judgment:

A.    Permanently restraining and enjoining Aon from violating Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)];

B.    Ordering Aon to disgorge ill-gotten gains wrongfully obtained as a result of its illegal conduct, along with prejudgment interest thereon; and

C.    Granting such further relief as the Court may deem just and appropriate.

Respectfully submitted,

A. David Williams (California Bar No. 183854)
Kara N. Brockmeyer
Charles E. Cain
Michael K. Catoe

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F Street, NE
Washington, DC  20549-5661
Telephone:    (202) 551-4548 (Williams)
Facsimile:    (202) 772-9246 (Williams)
E-mail:            williamsdav@sec.gov
                       brockmeyerk@sec.gov
                       cainc@sec.gov
                       catoem@sec.gov

Dated:  December 20, 2011